## IN THE UNTIED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

**THE HUNT CLUB HOMEOWNERS ASSOCIATION**, a Colorado non-profit corporation,

     Plaintiff,

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY**, a foreign corporation,

     Defendant.

---

## COMPLAINT AND JURY DEMAND

---

COMES NOW, Plaintiff, The Hunt Club Homeowners Association, by and through its attorneys, FURTADO LAW PC, for its Complaint against the above-named Defendant American Family Mutual Insurance Company, and states as follows:

### I.  NATURE OF THE ACTION

1. Plaintiff brings this action seeking economic and non-economic damages related to Defendant's breach of an insurance contract, statutory claims pursuant to C.R.S. §§ 10-3-1115 and 10-3-1116 arising from Defendant's unreasonable delay and denial of timely payment for insurance benefits including recoverable depreciation, breach of the covenant of good faith and fair dealing, and violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq*.

## II.  PARTIES

2.  The Hunt Club Homeowners Association, ("Plaintiff") is a homeowner association organized as a non-profit Colorado corporation with its principal place of business at 11002 Benton Street, Westminster, Colorado 80020.

3.  American Family Mutual Insurance Company ("Defendant") is a foreign corporation with its principal place of business located in Wisconsin and is authorized to do business in Colorado.

## III. JURISDICTION AND VENUE

4.  Jurisdiction is asserted pursuant to 28 U.S.C. §1332 and 28 U.S.C. § 1391. The amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties. Venue is proper because Defendant's insurance policy was purchased in Colorado and was intended to provide coverage for a property located in Colorado.

## IV. GENERAL ALLEGATIONS

5.  Plaintiff sought and obtained an insurance policy, Policy No. 05XT993303 (hereinafter "the Policy"), from Defendant for properties located between 1470-1522 South Quebec Way, Denver, Colorado, 80231 (hereinafter "the Properties").

6.  Upon information and belief, Plaintiff's policy with Defendant and Defendant's guidelines on overhead profit require Defendant pay overhead and profit if there are more than three trades involved on a claim, coordination is required or the repair work requires the involvement of a general contractor.

7. Upon information and belief, Defendant's policy regarding when overhead and profit is owed does not state that Defendant will pay overhead and profit only if a contractor or the insured first submit un-redacted invoices for work completed.

8. Upon information and belief, Defendant's policy with Plaintiff does not require actual invoices as proof of work completion for Defendant to release recoverable depreciation.

9. On or about May 24, 2016, a hail and windstorm hit Plaintiff's Properties causing exterior property damage.

10. Shortly after, Plaintiff filed its claim for benefits with Defendant and Defendant issued the following claims numbers to Plaintiff for building 1-59:

   a. 00225160995; 00225161009; 00225161004; 00225161121; 00225161119; 00225161117; 00225161113; 00225161110; 00225161106; 00225161109; 00225161103; 00225161105; 00225161102; 00225161101; 00225161097; 00225161088; 00225161094; 00225161086; 00225161087; 00225161083; 00225161079; 00225161076; 00225161074; 00225161070; 00225161073; 00225161068; 00225161069; 00225161067; 00225161065; 00225161062; 00225161063; 00225161059; 00225161061; 00225161057; 00225161050; 00225161055; 00225161052; 00225161049; 00225161043; 00225161045; 00225161038; 00225161040; 00225161037; 00225161036; 00225161033; 00225161030; 00225161034; 00225161029; 00225161048; 00225161047; 00225161026; 00225161025; 00225161024; 00225161021; 00225161018; 00225161012; 00225161014; 00225161011; 00225161123.

11. On or about August 8, 2016, Defendant conduct its inspection of the Properties and issued its initial estimate with a total replacement cost value for all claims of $1,588,866.17

12. On or about September 23, 2016, Scott Benglen with Claim Solutions, LLC, drafted a claim assessment for Plaintiff regarding outstanding issues not addressed by Defendant and specifically that Defendant failed to pay for step flashing, headwall flashing, shingle

starters, IWS on eaves pursuant to code, chimney flashing and gutter detach and reset to replace drip edge.

13. In this report, Mr. Benglen broke down the missed items as roughly $4,000-$5,000.00 in additional adjustments needed per building on Plaintiff's Properties or $236,000 to $295,000 in additional total payments owed by Defendant on Plaintiff's claims. Mr. Benglen also stated that since overhead and profit was owed on this project, that added expense would add an additional $377,000.00 to the claim alone.

14. Finally, Mr. Benglen's report addressed other damage including siding damage, HVAC coil damage, window and screen damage and deck and siding trim damage.

15. On or about September 24, 2016, Plaintiff hired Mr. Benglen as its public adjuster on these claims.

16. On or about November 14, 2016, Mr. Pickett met with Mr. Benglen onsite at the Properties and conducted his re-inspection.

17. Later that day, Mr. Benglen emailed Mr. Pickett stating that he had revised the estimate for building no. 1 as follows:

    a. General conditions of 8% or $3779.00 for storage container, commercial supervision, port-o-lets, OSHA safety monitors and traffic monitoring.

    b. L-flashing would be adjusted for what was replaced.

    c. Chimney flashings had been replaced by additional step flashing as there was no counter flashings on the chimneys.

    d. Amounts for gutter detach and reset as required by construction due to the gutters being strap hung originally.

    e. Estimate change to account for overhead and profit as there were multiple trades including 1) roofing, 2) gutters, 3) siding, 4) painting, 5) windows, 6) screen, 7) hvac and others.

4

18. Mr. Benglen, however, warned in his email that that his current estimate did not include any amount for exterior damage discussed during the re-inspection.

19. Finally, Mr. Benglen stated that, "we believe there are significant damages to the painting, siding, windows, screens and siding (both the siding and paint)."

20. On or about November 15, 2016 at 8:02 a.m., Mr. Pickett responded to Mr. Benglen's email and stated that he had blocked off the entire week to ensure that nothing is overlooked at the Properties in his revised estimate.

21. Mr. Benglen responded at 11:15 a.m. asking that Mr. Pickett specifically to address felt layers while he was at Hunt Club as Mr. Benglen was told by Brad Gramke with Heritage Roofing that there were 4 prior layers that had to be removed prior to repairs.

22. On or about November 17, 2016, Mr. Pickett emailed Mr. Benglen stating that:

    a. He talked with Mr. Gramke on November 16, 2016.

    b. He got on several roofs to look at the felt and only notice two layers of felt present. However, an onsite person instructed him that several buildings with steeper roofs had 3-4 layers around some skylights.

    c. He would be able to finish with his inspection by November 18, 2016.

23. On or about November 18, 2016, Mr. Benglen emailed Mr. Pickett pictures of the HVAC cap, chimney chase covers and chimney crickets and valleys on Building no. 257 to help with Mr. Pickett's re-inspection. These pictures were taken on November 3, 2016.

24. On or about November 29, 2016, at 9:04 a.m., Mr. Benglen emailed Mr. Pickett asking for release of Plaintiff's recoverable depreciation of buildings with completed work and ask what documentation Mr. Pickett needed for this to happen.

25. On or about November 29, 2016, at 10:23 a.m., Mr. Null responded back stating that Mr. Benglen would need to get a final invoice or certificates of completion. If the latter option, Mr. Null stated he would like to wait to process any deferred payments until Defendant completed the revisions from his November 14, 2016 inspection.

26. On or about November 29, 2016, at 10:26 a.m., Mr. Benglen replied to Mr. Null stating that the problem with invoices is that Plaintiff's contractor Heritage Roofing was invoicing Plaintiff in sections as work was completed and not one final invoice. Mr. Benglen replied he would get what he could from them and submit certificates of completion for work done. At 1:57 p.m., Mr. Benglen then sent the certificates of completion to Mr. Null.

27. On or about December 7, 2016, Mr. Benglen sent Mr. Null a follow-up email asking if Mr. Null needed any more documentation to release Plaintiff's recoverable depreciation.

28. On or about December 8, 2016, at 8:33 a.m., Mr. Null sent Mr. Benglen an email stating that he had completed the revisions and that all claims over $40,000 require management review. Once management approves of those claims, he would process any supplemental amounts due including recoverable depreciation.

29. On or about December 13, 2016, Mr. Null issued revised estimates for Plaintiff's Properties with $731,292.27 in added replacement cost value on Plaintiff's property claims (actual cash value in the amount of $243,792.52 missed and owed).

30. On or about December 13, 2016, Defendant also issued Plaintiff a check for $804,597.14.

31. On or about December 19, 2016, Mr. Benglen sent Mr. Null an email stating that all of Heritage Roofing's work was done at the Properties pursuant to Defendant's original estimates and asked for release of the remaining recoverable depreciation on the claims.

32. On or about December 20, 2016, at 8:47 a.m., Mr. Benglen emailed Mr. Null a certificate of completion for work completed at the Properties, asked for an update on Plaintiff's prior request for depreciation release from November 29, 2016, and asked for Mr. Pickett's revised estimates.

33. On or about December 20, 2016, at 9:54 a.m., Mr. Null responded mistakenly that all deferred and supplemental payments owed were sent out the prior week.

34. On or about December 30, 2016, Mr. Benglen emailed Mr. Null requesting overhead and profit as there was a general contractor on Plaintiff's claim no. 00225160995 and disputing other problems with Defendant's estimate including:

   a. Inquiring into why Defendant's original estimate dated August 8, 2016, has a replacement cost value of $30,589.38 when Mr. Benglen used the exact same Xactimate software and came up with a replacement cost value of $34,282.88. Mr. Benglen asked this question as the estimates included the same line items.

   b. Disputing Defendant's initial estimate amount because Defendant's estimate was only for the roof when there was more damage present including damage to the gutters, painting needed to be redone, window damage, AC damage, screen and decking damage.

   c. Re-requesting overhead and profit as the claim involved many trades and Plaintiff hired a general contractor on the claim.

   d. Noting that Defendant's estimate had 930 SF of painting for $1,656.42 and asking Defendant for clarification for where on building no.1 this damage was so that it can be fixed.

   e. Recapping that during the parties' joint re-inspection, both parties agreed there was collateral damage to siding near the L-flashing and that the damage was the

direct result of replacing the roof and covered. As a result, Mr. Benglen asked for an allowance for siding repairs and painting.

35. In this letter, Mr. Benglen also pointed out that at the joint re-inspection that there were several buildings in the association that had siding damage that Mr. Pickett believed could be repaired. Mr. Benglen pointed out that the damage could not be repaired and required replacement. Mr. Benglen asked Mr. Null to provide Defendant's methodology for repair of the siding damage to bring the siding to its pre-loss condition. Mr. Benglen further attached photos of the siding damage.

36. Finally, Mr. Benglen noted that Heritage Roofing's condition on the project were not accounted for in any of Defendant's estimates and asked Mr. Null for an explanation for this oversight.

37. On or about January 24, 2017, Mr. Benglen emailed Mr. Null asking him if he received his email and attachment from December 30, 2016. He also asked Mr. Null for an update on when Plaintiff's recoverable depreciation would be released and when to expect a response to Mr. Benglen's December 30, 2016, email. This email was resent on January 27, 2017.

38. On or about February 3, 2017, at 9:53 a.m., Mr. Benglen sent Mr. Null permit receipts.

39. On or about February 3, 2017 at 11:22 am., Defendant's adjuster Sharon Larsen sent Mr. Benglen a follow-up email stating that she had taken over the case and would be answering all questioning moving forward. Mr. Larsen answered Mr. Benglen's December 30, 2016, questions and specifically:

   a. Ms. Larsen stated that Defendant incorrectly wrote its initial estimate on August 8, 2016 based on new construction pricing instead of restoration pricing and corrected the problem. She also mentioned that there were scope items corrected

8

and sarcastically remarked that Defendant could revise its estimate again to much lower pricing if Mr. Benglen wanted.

b. She stated that Defendant is open to reviewing Plaintiff's request for overhead and profit but that further review was needed before issuing payment on this. She also stated incorrectly that overhead and profit would be allowed if Mr. Benglen was willing to submit un-redacted invoices of all work completed. As stated above, Plaintiff believes this requirement was fabricated by Ms. Larsen to delay paying overhead and profit.

c. Regarding Mr. Benglen's question 4 and 5 dealing with painting and collateral damage, Ms. Larsen said further review was necessary to respond.

40. On or about February 3, 2017, at 11:33 a.m., Mr. Benglen email Mr. Larsen and sked if there was an update on recoverable depreciation release. At 11:36 a.m., she responded and asked if there was outstanding money owed other than the payment of $804,597.14 already paid. Mr. Benglen then responded and stated that additional depreciation was owed along with overhead and profit.

41. On or about February 10, 2017, Ms. Larsen emailed Mr. Benglen and stated she received Plaintiff's permit receipts.

42. On or about February 13, 2017, at 7:18 a.m., Mr. Benglen emailed Ms. Larsen that he had reached out to all contractors on the claims to see if they have had any more detailed permit receipts available. He also asked for an update on overhead and profit and additional items inquired into on December 30, 2016.

43. On or about February 14, 2017, Ms. Larsen sent Mr. Benglen a follow-up email stating that:

a. She spoke with Mr. Pickett and Mr. Pickett denied having any conversation with the roof related to extras now being claimed were owed.

b.  Mr. Pickett denied there was supervision on the roofs during the five days he was inspecting the roofs.

c.  Mr. Pickett indicated there was two trailers present at Hunt Club but no storage containers or units.

d.  In Ms. Larsen's opinion, there was no agreement to add these items to Defendant's estimate.

e.  Mr. Pickett's estimate included collateral siding damage where he felt the damage was a direct result of the replacement only.

f.  Ms. Pickett asked for a list of documents from Mr. Benglen where Mr. Benglen believed there was damaged related to flashing replacement not already accounted for. She explained she would take this list to Mr. Pickett for review.

44. Mr. Benglen responded immediately that Mr. Pickett seemed to be agreeing to the collateral damage to siding near the step and headwall flashing. He also stated that during the inspection, he pointed out to Mr. Pickett several circular fractures that needed to be addressed. From his recollection, Mr. Pickett did not believe that Defendant owed for the step and headwall flashing. Finally, he asked whether Defendant agreed that collateral damage to siding near the step and headwall flashing was covered but not the siding circular fracture damage.

45. On or about February 16, 2017, pursuant to Ms. Larsen's request for documentation, Mr. Benglen drafted a Collateral Damage Investigation Report based upon his re-inspection of the Properties. Mr. Benglen's Report concludes that a complete re-inspection is required to determine the extent of damages to the siding at Plaintiff's properties.

46. On or about February 21, 2017, at 8:27 a.m., Ms. Larsen emailed Mr. Benglen stating that she would address issues in Plaintiff's case that week.

47. On or about February 28, 2017, Ms. Larsen emailed Mr. Benglen stating that based on her conversation with Mr. Pickett, another inspection was required to evaluate siding and flashing damage. She further indicated that Mr. Pickett thought that hail damage photos were limited to a couple of elevations on a couple of buildings and was not Property wide. She further stated that Defendant would not pay for a contractor's negligent installation and resulting collateral damage.

48. She also commented that Mr. Benglen had only presented concerns for claim no. 00225160995 and had not provided Defendant with an estimate as to all other claims at Plaintiff's Properties. Regarding this claim, Mr. Pickett indicated that he had adjusted the claim properly for siding. For all other concerns, she stated that they could be addressed during the re-inspection.

49. On or about March 4, 2017, Mr. Benglen emailed Ms. Larsen that he was creating a report of the step and headwall damage. Mr. Benglen also restated that overhead and profit was owed as the general contractor for Plaintiff would be sub-contracting out the other trades including siding, paint, decks and AC.

50. On or about March 15, 2017, Mr. Benglen emailed Mr. Larsen Heritage Roofing's invoice on its claims in the amount of $2,359,093.32 ($1,898,350.53 for roofing, $67,560.57 for gutters and $393,182.22 for overhead and profit owed).

51. On or about March 29, 2017, Mr. Benglen emailed Mr. Larsen his collateral damage report for step and headwall damage and stated that the damage observed seemed to be fairly wide spread throughout the community after roof reconstruction. He also re-requested that Defendant release Plaintiff's recoverable depreciation based on the

completion certificate dated December 20, 2016. Finally, he also re-requested that
Defendant pay for overhead and profit as Plaintiff hired a general contractor on the
claims.

52. On or about April 1, 2017, Mr. Benglen sent Mr. Larsen a letter once again asking for
release of Plaintiff's recoverable depreciation and reminding her that Defendant received
Mr. Benglen's certificate of completeness back on December 20, 2017. Mr. Benglen also
mentioned that overhead and profit was owed based on the number of trades on the
project.

53. Mr. Benglen further summarized all his outstanding requests for overhead and profit and
release of Plaintiff's recoverable depreciation including on the following dates:
December 20, 2016; December 30, 2016; January 24, 2017; March 15, 2017 and March
29, 2017. Mr. Benglen then requested an explanation either way regarding whether
Defendant would release Plaintiff's recoverable deprecation.

54. On or about April 4, 2017 at 4:42 p.m., Ms. Larsen emailed Mr. Benglen as a follow-up
only to his March 29, 2017 email and asked if Mr. Benglen believed that the damage
identified in his report was common to all buildings in Plaintiff's Properties.

55. On or about April 4, 2017, at 6:20 p.m., Mr. Benglen responded and stated that all the
buildings he looked at had 60% similar damages at step and headwall flashings. He also
asked Ms. Larsen what more documentation she needed to release Plaintiff's recoverable
depreciation.

56. On or about April 10, 2017 at 7:20 a.m., Mr. Benglen sent Ms. Larsen an email with
photos of collateral siding damage.

57. On or about April 10, 2017 at 2:57 p.m., Ms. Larsen responded stating that from now on Plaintiff would be required to submit actual invoices to get its recoverable depreciation released and that she would release recoverable depreciation on completed work where Defendant had invoices.

58. On or about April 10, 2017, at 5:19 p.m., Mr. Benglen replied to Ms. Larsen and stated that Defendant should have received Heritage Roofing's invoice on March 15, 2017 and attached the invoice again to his email. He also mentioned that overhead and profit was owed on that invoice.

59. On or about April 10, 2017, at 5:21 p.m., Ms. Larsen responded that Mr. Benglen would need to get Heritage Roofing's invoice divided out by building and that permit fee invoices were also needed.

60. On or about April 10, 2017, at 5:46 p.m., Mr. Benglen emailed Ms. Larsen asking if this was Defendant's new procedure because all prior claims with Defendant that Mr. Benglen worked on had recoverable depreciation paid on one invoice. He also stated that Heritage Roofing did not plan or prepare for having to create 59 separate invoices.

61. On or about April 10, 2017, at 5:52 p.m. Ms. Larsen responded stating that if there is a dispute, Plaintiff must itemize its invoice by building or in one invoice with all buildings itemized in the invoice to recover depreciation. She also mentioned that actual permit invoices were also required.

62. On or about April 10, 2017, at 5:55 p.m., Mr. Benglen responded to Ms. Larsen asking her what dispute existed as there was no dispute regarding the roofing or gutter line items

and that Mr. Benglen believed overhead and profit was owed. Mr. Benglen also sent Ms. Larsen the permit receipts.

63. On or about April 10, 2017, at 6:05 p.m., Ms. Larsen responded to Mr. Benglen stating that Mr. Null believed Mr. Benglen had accepted Defendants estimates as written other than overhead and profit. She further stated that Defendant has to-date only received one estimate for one building from Mr. Benglen. Regarding the certificate of completion, Mr. Null told Ms. Larsen that he accepted the certificates because he felt the work was completed for the amount on Defendant's estimates with no other issues. Mr. Null did not apparently understand that the certificates were based on a disputed amount of damages.

64. Finally, at 6:09 p.m., Mr. Benglen responded to Ms. Larsen stating that there was no dispute only as to the roofing element of the claims. However, there was a dispute regarding gutter detach and reset and exterior estimate amounts.

65. On or about April 11, 2017, Ms. Larsen emailed Mr. Benglen stating the following:

   a. After completing her review of the collateral damage issue, she was going to send an adjuster out to walk the Properties with Mr. Benglen to resolve the issue. However, Mr. Larsen stated that Defendant would not pay for any problems with poor workmanship such as roof material being dropped onto siding as it fell to the ground, etc.

   b. In her opinion, the only collateral damage owed is where siding face popped in a location that makes it highly likely that it was from an attempt to remove the old flashing. She also stating that Defendant would inspect for any missed hail damage. Further, Defendant will only pay for direct physical damage when that damage makes replacement appropriate over repair.

   c. Regarding the siding, however, she stated that Defendant believed the siding was the subject of a class action and that any siding that is defective is excluded under the Policy. On this point, she asked Mr. Benglen to have Plaintiff inspect its records for compensation related to siding. She stated that Defendant needed to be convinced that the siding was not already compensated for but that Defendant also in the same breath did not require proof at this time.

d.  She also stated that after the next week, she would look at recoverable depreciation owed but only if she received revised un-redacted invoices from Plaintiff.

66. On or about April 20, 2017, Mr. Benglen emailed Ms. Larsen asking her for when Defendant planned to pay for overhead and profit.

67. On or about April 24, 2017, at 4:10 p.m., Ms. Larsen sent Mr. Benglen an email stating she was going to start processing recoverable depreciation on the roof and gutters that were deferred. She also mentioned that the re-inspection request was made.

68. On or about April 24, 2017, at 5:34 p.m., Mr. Benglen responding again asking about the status of overhead and profit based upon the amount of trades in the claims. Ms. Larsen replied, however, that she was just working on base stuff right now.

69. At 4:49 p.m., Ms. Larsen's final response on this was that she was working on overhead and profit as it was determined even though it was the easiest portion of Plaintiff's claim to determine. Ms. Larsen specifically stated she need the re-inspection completed and all scope issues addressed so she could make an 'educated decision' on overhead and profit.

70. On or about April 29, 2017, Defendant issued Plaintiff a check for supplemental ACV owed in the amount of $15,895.54.

71. On or about May 4, 2017, Ms. Larsen surprisingly sent Plaintiff a letter stating that the remaining recoverable depreciation on all claims outstanding were being released in the amount of $345,058.37 and enclosed a check for this amount. Mr. Larsen also noted that Defendant was working with Mr. Benglen on completing an inspection of damages that occurred during the re-roof.

72. On or about May 16, 2017 at 9:43 a.m., Mr. Benglen emailed Ms. Larsen and asked why overhead and profit was not yet paid as all remaining work also was being contracted out to subcontractors.

73. On or about May 16, 2017 at 9:55 a.m., Ms. Larsen responded to Mr. Benglen and stated that no overhead and profit was owed other than was included in Defendant's Xactimate estimate for first line contractors. She, however, noted that Defendant just received the estimates related to the last inspection and would reevaluate the overhead and profit question after she reviewed those estimates.

74. On or about May 18, 2017, Mr. Benglen sent Ms. Larsen a letter questioning Defendant's repair methodology as indicated by Wes Merriam's May 7, 2017 letter including:

   a. That Defendant believes it can do 'spot painting' at various small amounts of siding, fascia and trim around the properties even though spot painting cannot match existing faded paint. Further, Mr. Benglen indicated that he had adjusting many other claims with Defendant and Defendant had never sought to spot paint in any other case. Mr. Benglen believes that this is not an adequate repair method as it will not result in returning Plaintiff to its pre-loss condition.

   b. Defendant indicated that it could replace individual siding that was damaged even though the old siding has face nailing wherein the lap siding is nailed through the lower edge of the lap face into the siding below. As a result, the removal of one siding necessarily destroys the siding above it like a domino effect. Plaintiff believes that there is extensive covered collateral siding damage that Defendant's coverage determination on this issue is lacking because of its ignorance and/or willfully avoidance of additional damages caused by collateral damage from replacing siding.

75. Finally, Mr. Benglen stated that he hired an independent licensed adjuster to draft a property wide estimate for all items not properly adjusted by Defendant. Plaintiff believes this amount is close to $2 million in additional covered benefits or $40,000 to $50,000 per building.

16

76. Therefore, although Plaintiff provided Defendant with the necessary documentation to recover its recoverable depreciation, Defendant unreasonably delayed and denied paying Plaintiff's recoverable depreciation for five months.

77. Defendant had no basis in policy language, its own internal guidelines or otherwise for delaying Plaintiff's recoverable depreciation and Ms. Larsen's statements that actual invoices were required prior to release is unjustified.

78. Furthermore, based on the above facts, Defendant's continued denial of overhead and profit on Plaintiff's claim is unjustified and unstated. The facts above indicate no rationale has been stated for Defendant's denial of overhead and profit. All inquiries by Mr. Benglen have been met with a wall of silence. Since industry standard is three trades or more to warrant overhead and profit, and the complexity and coordination on this claim warrant adding overhead and profit, Defendant has unreasonably delayed and denied payment of overhead and profit on this claim without a reasonable basis.

79. Finally, as indicated in Mr. Benglen's May 18, 2017 letter, Plaintiff believes that Defendant has unreasonable delay and denied additional not yet defined amounts on siding and paint. Plaintiff believes that Defendant is using an unreasonable repair methodology that is meant to cut corners and costs for Defendant at Plaintiff's expense.

80. As a consequence of Defendant's conduct in unreasonably delaying and denying Plaintiff's covered benefits due and owning under the Policy, Plaintiff has incurred and continues to incur damages.

## V.    FIRST CLAIM FOR RELIEF
*(Breach of Contract)*

81. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

82. The Policy creates a contract of insurance.

83. By its actions, as described above, Defendant breached the contract of insurance.

84. As a direct and proximate result of said breach, the Plaintiff is entitled to damages in an amount to be determined at trial.

## VI.    SECOND CLAIM FOR RELIEF
*(Violation of C.R.S. § 10-3-1115 and Relief Pursuant to § 10-3-1116)*

85. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

86. C.R.S. § 10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

87. Plaintiff is a first-party claimant under C.R.S. § 10-3-1115.

88. Defendant has denied the Plaintiff's claim without a reasonable basis within the meaning of C.R.S. § 10-3-1115.

89. C.R.S. § 10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

90. Because of Defendant's actions, as described above, violate C.R.S. § 10-3-1115, Plaintiff brings this claim to recover its reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. § 10-3-1116.

## VII.    THIRD CLAIM FOR RELIEF
*(Breach of the Covenant of Good Faith and Fair Dealing)*

91.    Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

92.    Defendant, its representatives, and its adjusters owed Plaintiff the obligation to act in good faith and fair dealing.

93.    Defendant owed Plaintiff the non-delegable duty to investigate the claim objectively and not just to hunt for facts from which to deny benefits or attempt to not pay the correct amount owed.

94.    Defendant owed Plaintiff the duty to give equal consideration to the financial interests of its insureds and not to give greater consideration to its own financial interests while investigating and adjusting its insureds' claims.

95.    Defendant sold Plaintiff the coverage at issue intending to provide benefits for the covered losses such as hailstorms that occur within the policy period.

96.    Plaintiff cooperated with Defendant in the processing of its claim for the covered benefits.

97.    Plaintiff did not fail to mitigate or minimize its damages.

98.    Plaintiff cooperated with Defendant's investigation and did not erect any obstacles to Defendant's ability to investigate and evaluate Plaintiff's claims for the covered benefits owed.

99.    Defendant knew that Plaintiff purchased the Policy to protect the covered premises.

100.    Defendant knew that its decision to deny benefits owed to Plaintiff was intentional and not accidental.

101.    Defendant knew that its decision to deny paying benefits owed to Plaintiff would cause emotional distress and harm.

102.    Defendant knew that it owed an obligation of good faith and fair dealing to Plaintiff.

103.    Defendant knew that its denial to pay the benefits owed would cause Plaintiff financial hardship.

104.    Defendant breached its obligations to Plaintiff by failing to pay the proper amount on Plaintiff's claims by hiring agents/adjusters and estimators who did not properly investigate the loss.

105.    Defendant breached its duty of good faith and fair dealing by failing to conduct a proper investigation of the loss.

106.    Defendant breach of its covenant of good faith and fair dealing amounts to bad faith breach of the insurance contract causing Plaintiff damages and losses to be determined at trial.

## VIII.    FOURTH CLAIM FOR RELIEF
*(Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq.)*

107.    Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

108.    Plaintiff is an actual consumer of the Defendant's goods, services, or property and was injured as a result of unfair or deceptive insurance industry practices.

109.    Defendant had a duty to act reasonably and in good faith in handling Plaintiff's claim and in the payment of Plaintiff's insurance claim, including the obligation to act with ordinary, reasonable diligence in investigating the claim submitted by Plaintiff and in determining the amounts due and owing under the Policy in question, and to pay all amounts due and owing.

110.    Defendant engaged in unfair claim settlement practices by, *inter alia*, willfully (1) making, issuing, circulating, or causing to be made, issued, or circulated, an estimate or omission which misrepresents the benefits, advantages, conditions, or terms of the insurance policy; (2) misrepresenting pertinent facts or insurance policy provisions relating to the coverage at issue; (3) refusing to pay claims without conducting a reasonable investigation based upon all available information; (4) not attempting in good faith to effectuate prompt, fair, and equitable settlement of the claim in which liability has become reasonably clear; (5) compelling Plaintiff to institute litigation to recover amounts due under an insurance policy by offering substantially less than the what is owed; (6) denying payment of owed benefits without a reasonable basis; (7) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim; (8) otherwise engaging in conduct proscribed by C.R.S. § 10-3-1104.

111.    Defendant knew that the Policy and its own internal guidelines require overhead and profit be paid by industry standard when one of the following conditions is met:

a.    There are three or more trades involved on a repair;

b.    There is coordination or complexity in scheduling repairs between trades;

c.    Or the Plaintiff hires a general contractor on a repair claim.

112.    Defendant intentionally provided Plaintiff or Mr. Benglen with no information regarding why it was denying overhead and profit when it was clearly owed. Defendant has yet to pay overhead and profit or to explain its position for denying overhead and profit.

113.    Defendant also knew that the Policy requires payment of Plaintiff's replacement cost value or recoverable depreciation after Plaintiff provides Defendant with proof that the work was completed. This is typically done with a sworn certification of completion. In this case, Defendant instructed Mr. Benglen that all he had to do was submit a sworn proof of loss. When Ms. Larsen got involved on the claim, Defendant changed its position and wanted certificates of completion and un-redacted building specific invoices for release of Plaintiff's recoverable depreciation. Defendant intentionally issued 59 claims numbers in this case to make providing proof of work completion difficult. Defendant intentionally failed to release Plaintiff's recoverable depreciation for over five months.

114.    Defendant's position in this case has been to stonewall Plaintiff and Mr. Benglen's requests for information for its denials on Policy coverage issues that are clear like recoverable depreciation and overhead and profit. This behavior is a violation of the C.R.S. § 10-3-1104(1)(h).

115.    Defendant's denial of recoverable depreciation, overhead and profit and failing to conduct a reasonable investigation since August 8, 2016 was made without a reasonable basis and was willfully and wantonly to save Defendant money.

116.    The challenged claim settlement practices listed in paragraph 111 above occurred in the course of Defendant's insurance relationship with Plaintiff, acting on behalf of the named insured.

117.    The practice by insurance companies of unreasonably delaying and denying payment of a covered benefit significantly affects the public as actual or potential consumers of insurance. Sections 10-3-1115 and 10-3-1116, C.R.S., were enacted by the Colorado General Assembly as a remedial measure to curb abuses in the insurance industry. *Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 976 (Colo. App. 2011). The General Assembly acknowledged that, prior to these Sections' enactment, the burden of proof was too onerous for most litigants to be able to prove. *Id.* at 974. Thus, the General Assembly passed the Sections specifically contemplating the number of consumers of insurance who have been affected by the challenged practice and those who may be affected by the challenged practice in the future.

118.    The challenged claims settlement practices listed in paragraph 111 above that Defendant has engaged in significantly and negatively impacts the public because of the disparity in bargaining power between Defendant and its insured homeowners and their contractors. "[A]lthough they may not technically qualify as contracts of adhesion, [insurance contracts] are not ordinary, bilateral contracts, either; they are 'not the result of bargaining' and are often imposed on a 'take-it-or-leave-it basis.'" *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1049 (Colo. 2011). "Because of the unequal bargaining position between insurers and insureds, and because insureds are generally not "highly sophisticated in the art of reading insurance policies, an increased risk exists that insurer may intentionally, or inadvertently, exploit insureds." *Id.* "The motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against

23

calamity, rather than to secure commercial advantage." *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1363 (Colo. 1993).

119.    Defendant's engagement in unfair and deceptive trade practices significantly impact the public due to the public nature of the insurance industry.

120.    The plain language of the Policy that Defendants' issued to the Plaintiff, especially when viewed through the lens of an objectively ordinary and reasonable insured, necessitates payment of replacement cost value with only a certificate of completion from the contractor and overhead and profit with the complexity of this claim and the fact that a general contractor was involved. Nothing in the policy requires un-redacted invoices individualized by building for payment of recoverable depreciation or overhead and profit. If not, and Defendant is allowed to not uniformly pay pursuant to its policy terms and internal guidelines, other actual contractors that help consumers of Defendant's insurance products are at risk because they cannot pay their own bills on time. Contractors will then file mechanic liens on insured to secure benefits resulting in substantial harm to consumers. Contractors that contract with insureds should be able to rely on a uniform and systematic payment method by Defendant in completing repairs. The entire construction business operates on loss business where work is done and promptly paid by insurers. Homeowners are also harmed when insurers intentionally undervalue claims.

121.    The challenged claims settlement practices listed in paragraph 111 above that Defendants has engaged in occurred and impacted Plaintiff and its contractors.

122.    Plaintiff and its contractors have a legally protected interest in receiving fair and timely payment of covered insurance benefits under the Policy. Plaintiff has yet to receive

overhead and profit and recoverable depreciation which are owed on its claims. Defendant has also substantially undervalued Plaintiff's claim by adopting a repair methodology that does not put Plaintiff in its pre-loss condition.

123.    Defendant's engagement in the challenged claim settlement practices caused Plaintiff and its contractors injury because neither have been received payment in a fair and timely manner.

124.    The challenged claim settlement practices directly caused Plaintiff and its contractor's injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that this Court enter judgment in its favor and against Defendant on its Claims for Relief as follows:

1.    Damages for Defendant's breach of contract;

2.    All unpaid covered benefits owed under the party;

3.    Pursuant to C.R.S. § 10-3-1116, two times the amount of all covered benefits under the Policy;

4.    Pursuant to C.R.S. § 6-1-113, an amount equal to the greater of:

   a.    The amount of actual damages sustained; or

   b.    Five hundred dollars; or

   c.    Three times the amount of actual damages sustained, if it is established by clear and convincing evidence that Defendant engaged in bad faith conduct;

5.    Costs, expert witness fees, and attorneys' fees per statute incurred in

prosecuting its claims;

6.    Other damages from Defendant's bad faith and breach of the covenant of good

faith and fair dealing including damages resulting from Defendant's bad faith

refusal to cover the damages to Plaintiff's property;

7.    Pre- and post-judgment interest; and

8.    For such other and further relief as this Court may deem just.

Respectfully submitted this 18th day of July 2017.


FURTADO LAW PC


*s/ Nathanael Archuleta*_____
Nathanael Archuleta, Esq.
*Attorney for Plaintiff*

26